Bonnie **BRECKER,** Eugene Kamish, and Joel Hochberg, on behalf of themselves and all others similarly situated, Plaintiffs,

Eugene Kamish and Joel Hochberg, Plaintiffs-Appellants,

v.

**QUEENS B'NAI B'RITH HOUSING DEVELOPMENT FUND CO., INC., and Samuel R. Pierce, Jr., as Secretary of the United States Department of Housing and Urban Development, Defendants-Appellees.**

No. 349, Docket 85–6148.

United States Court of Appeals, Second Circuit.

Argued Nov. 27, 1985.

Decided Aug. 12, 1986.

Herbert Semmel, New York City (Lewis A. Golinker, New York City, New York Lawyers for the Public Interest, of counsel), for plaintiffs-appellants.

John H. Beers, New York City (Donald A. Derfner, New York City, Olnick, Boxer, Blumberg, Lane & Troy, of counsel), for defendant-appellee, Queens B'Nai B'rith Housing Development Fund Co., Inc.

Charles S. Kleinberg, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty. for E.D.N.Y., Robert L. Begleiter, Asst. U.S. Atty., Howard M. Schmeltzer, Anthony J. Ciccone, Jr., Office of Gen. Counsel, U.S. Dept. of Housing and Urban Development, of counsel), for defendant-appellee, Samuel R. Pierce.

Before TIMBERS, PIERCE and MINER, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, Thomas C. Platt, Jr., *Judge*, granting defendants' motion for summary judgment and holding that a housing project federally funded pursuant to Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q, may admit only one or some of four classes of persons for whose benefit Section 202 was enacted, where the needs of the group or groups admitted materially differ from those of the three excluded groups. *See Brecker v. Queens B'nai B'rith Housing Development Fund Co., Inc.*, 607 F.Supp. 428 (E.D.N.Y.1985).

Eugene Kamish and Joel Hochberg, appellants herein,[1] argue in principal part that they are mildly retarded persons capable of independent living and are "developmentally disabled" adults within the definition of that term under Section 202; that Section 202 does not authorize the exclusion of developmentally disabled persons capable of independent living from the well

1. The other named plaintiff, Bonnie Brecker, withdrew from the action in the district court.

elderly in Section 202 housing projects designed for independent living; that such exclusion constitutes unlawful discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and that failure of the Department of Housing and Urban Development ("HUD") to publish certain memoranda by Assistant Secretaries for Housing in 1983 and 1984 permitting separation of the developmentally disabled in Section 202 housing projects violated the Administrative Procedure Act, 5 U.S.C. § 552.

We hold that the exclusion of Kamish and Hochberg from the Queens B'nai B'rith Housing project ("QBB") did not violate Section 202 of the Housing Act or Section 504 of the Rehabilitation Act, and that the failure to publish the 1983 and 1984 memoranda did not violate the Administrative Procedure Act. We therefore affirm the judgment of the district court substantially for the reasons set forth in its opinion.

## BACKGROUND

The essential facts in this case are not in dispute and are amply set forth in the district judge's opinion. QBB is an apartment building in Flushing, New York that was financed by HUD loans pursuant to Section 202 of the Housing Act of 1959, as amended, 12 U.S.C. § 1701q.[2] QBB provides certain "minimal services," such as heat and maintenance, as would an ordinary non-Section 202 building. In addition, it provides for its tenants one special service, a "social coordinator," who is also the building manager, who assists the tenants in tenant-sponsored social activities. Ten percent of the apartments are specifically designed for mobility-impaired (wheelchair-bound) persons and are not at issue herein.

2. Section 202 provides for loans for housing and related facilities for elderly or handicapped families. See 12 U.S.C.A. § 1701q (1980 & Supp.1985).

3. Two nonelderly, non-mobility impaired individuals with some physical disabilities live in QBB. These tenants were apparently admitted due to a misunderstanding on the part of the Regional HUD office. See 607 F.Supp. at 439.

Almost all the remaining apartments are leased to persons over 62 years of age who are capable of living independently.[3]

Appellants Kamish and Hochberg are mildly retarded persons whose IQs are apparently between 50 and 75 and who claim to qualify to live in QBB as "developmentally disabled" persons under 12 U.S.C. § 1701q and 42 U.S.C. § 6001(7). Although the district court did not make a specific finding as to whether plaintiffs are developmentally disabled, it noted their contentions, including their claim to be capable of living independently and of drawing whatever special services they may need from the community rather than from apartment building staff. Appellants sought and were denied admission to QBB. Although subsequent to QBB's exclusion of appellants HUD's Regional Office had opined that exclusion of developmentally disabled persons from QBB would not comport with Section 202 requirements, the agency's National Office later approved such exclusion. On this point, Judge Platt ruled that the Regional Office had misconstrued Section 202, and that appellants could not bind either the agency or QBB to that misconstruction. 607 F.Supp. at 439–40. This appeal followed.

## DISCUSSION

This case requires careful statutory construction to determine principally whether, in enacting Section 202 of the Housing Act and Section 504 of the Rehabilitation Act, Congress required a sponsor of Section 202 federally subsidized housing to open its doors to *all* handicapped persons as defined by the Housing Act, rather than to only one or some of the four statutorily benefited groups.[4] At bottom, the case asks us to

Since we hold that appellants have no entitlement to admission to QBB, this collateral issue pertaining to the two nonelderly, non-mobility impaired tenants at QBB is not germane to this case.

4. The four groups include the "elderly," defined as persons over 62 years of age; and the "handicapped" as defined in Section 202, 12 U.S.C. § 1701q(d)(4)(A), (B), and (C) and in applicable

discern how Congress has chosen to address important social issues relating to safeguarding the interests of elderly and handicapped persons in our society.

We need not set forth herein the statutory framework of Section 202 housing, as that is summarized in Judge Platt's well-reasoned and comprehensive opinion. *See* 607 F.Supp. at 431–33. Nor need we address whether appellants herein in fact are "developmentally disabled" within the statutory definition of that term. Rather, we shall assume that appellants are "developmentally disabled"[5] and move directly to the question of whether they therefore were entitled to admittance to an available apartment in QBB.

Appellants acknowledge on appeal that as "developmentally disabled" persons within the statutory definition of that term, they require certain "care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated." However, they argue that the district court erred in construing that subsection to mean that "someone in the Section 202 project must be responsible for planning and coordinating the services needed by the plaintiffs." 607 F.Supp. at 433. We disagree. When Section 202 was amended in 1974 to apply to developmentally disabled persons, Congress added a new subsection (f) to Section 202, requiring the Secretary of HUD to assure that Section 202 housing "be in appropriate support of, and supported by, applicable State and local plans which respond to Federal program requirements by providing an assured range of necessary services for individuals occupying such housing." 12 U.S.C. § 1701q(f). Indeed,

Congress took "special notice of the need for supportive services that are essential to the maintenance of the § 202 housing program." S.Rep. No. 693, 93d Cong., 2d Sess. *reprinted in* 1974 U.S. Code Cong. & Admin.News 4273, 4347 (1974). Thus, while appellants may well be able to derive the actual services that they need from the surrounding community, rather than from QBB, which is not equipped to provide their required services, appellants overlook the problem, of which Congress was clearly mindful, that the QBB support staff, consisting solely of a social coordinator for senior citizen needs, simply is not equipped to support, coordinate or otherwise assist in ensuring adequate community-based support services for developmentally disabled persons. Apropos this problem, the district court also correctly recognized that "Section 202 is more than a rent and roof subsidy ... Rather, it is a housing *and* services program." 607 F.Supp. at 434 (emphasis in original); *see* 42 U.S.C. § 6001(2) (Section 202 facility should be "designed primarily for the delivery of one or more services" for eligible tenants).

The problem of special services for appellants—even if needed solely to support or coordinate community-based services—highlights the rationale of Congress's exactitude in drafting Section 202 so as to allow a sponsor to provide housing for the elderly *or* the handicapped if the sponsor so wishes. As originally enacted in 1959, Section 202 provided for loans to sponsors to provide housing *exclusively* for the elderly. *See* Housing Act of 1959, P.L. 86–372, § 202, 76 Stat. 667 (1959). When Congress expanded the program in 1964 to

___

regulations promulgated by the Secretary of HUD thereunder. The "handicapped" comprise three subgroups: the "mobility impaired" and the "chronically mentally ill," as defined elsewhere; and the "developmentally disabled," as defined in Section 202, 12 U.S.C. § 1701q(d)(4) and in Section 102(7) of the Developmental Disabilities Services and Facilities Construction Act of 1950, 42 U.S.C. § 6001(7). *See* 607 F.Supp. at 431.

**5.** We need not decide whether all developmentally disabled persons categorically may or may

not be able to live independently. It seems clear that, to some extent, being "developmentally disabled" by definition means being limited "in a variety of broad areas of major life activity central to independent living." H.R. Rep. No. 1188, 95th Cong. 14, U.S.Code Cong. & Admin.News 1978, pp. 7312, 7368. In any event, we agree with the district court's construction of Section 202 that the program was designed to provide housing *and* services to persons who need both.

include housing for certain nonphysically handicapped persons, *see* P.L. 88–560, § 203(a)(2)(A), 78 Stat. 769, 783 (1964), and when it again expanded the program in 1974 to include housing for other handicapped persons, including those who are developmentally disabled, *see* P.L. 93–383, § 210(b), 88 Stat. 633, 669–70 (1974), it was careful to employ statutory language in these amendments that clearly permits HUD to approve a loan to any single sponsor who wishes to build housing only for the elderly or only for some class of handicapped persons or for a combination of eligible groups. A sponsor need not serve *all* eligible needy groups. *See* 12 U.S.C. § 1701q(a)(2) ("the Secretary may make loans to *any* ... sponsor ... for the provision of rental or cooperative housing ... for elderly *or* handicapped families....") (emphasis added); *see also id.* § 1701q(a)(1) ("The *purpose* of this section is to assist private nonprofit corporations ... to provide housing ... for elderly *or* handicapped families") (emphasis added); *id.* § 1701q(d)(1) ("the term 'housing' means structures suitable for dwelling use by elderly *or* handicapped families") (emphasis added). That Congress meant that *individual sponsors* may choose to provide housing and services for "elderly *or* handicapped" persons is clear, since, when Congress spoke of *program-wide* requirements, it conversely used the conjunctive expression, "elderly *and* handicapped." *See, e.g.,* 12 U.S.C. §§ 1701q(a)(6)(B), 1701q(i)(3), 1701q(j)(1), and 1701q(k)(1).

Nor is Congress's distinction between elderly and handicapped persons unreasonable. Congress perceived that the incentive for potential sponsors to seek Section 202 loans would be maximized if sponsors were free to provide housing for a particular group or groups that the sponsor wished to serve. Congress apparently further understood that different groups very likely would have different needs. Congress even referred to projects that are "specifically designed to meet the needs of handicapped persons" and required that a certain percentage of such handicapped projects be built each year. 12 U.S.C. § 1701q(h).[6] Further, Congress explicitly provided that "[t]he Secretary shall encourage the provision of small and scattered site group homes and independent living facilities for nonelderly handicapped persons and families." 12 U.S.C. § 1701q(k)(2).

In sum, we think the district court properly concluded that QBB is neither equipped nor required under Section 202 to admit appellants, and we therefore affirm the judgment of the district court as to Section 202. *See Edge v. Pierce*, No. 82–51, slip op. at —— (D.N.J. May 22, 1984) ("there is no statutory requirement that ... the different populations eligible for § 202 housing be integrated in a single complex").

Appellants also contend that the 1983 and 1984 HUD memoranda by HUD Assistant Secretaries Abrams and Barksdale constitute a new HUD policy regarding Section 202 housing and that the failure to publish these memoranda in the Federal Register thus violated the Administrative Procedure Act, 5 U.S.C. § 552. We disagree. We are not persuaded that these memoranda constitute a change in HUD's position. HUD regulations had made clear that a prospective Section 202 sponsor may apply to sponsor housing for a particular

---

6. While we are mindful that there may be a shortage of housing for handicapped persons, *see, e.g.,* Report on the Housing Act of 1985, House Comm. on Banking, Finance and Urban Affairs, 99th Cong., 1st Sess., Rep. No. 99–230 (July 26, 1985) at 36–37, we do not think that the appropriate remedy for such a problem would be for the courts to alter the existing statutory framework. Nor are we persuaded to reverse the reasoned view of the district court simply because members of a House Committee have expressed disagreement with it in subsequent legislative history accompanying proposed amendments not yet passed. *Id.* Such disagreement may prove important in Congress's future reshaping of existing law; it does not bind judicial interpretation of current law. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963).

"anticipated occupancy (elderly and/or handicapped [physically handicapped or developmentally disabled ...])" by specifying the subclass or subclasses of eligible tenants that it wishes to serve. 24 C.F.R. § 885.210(a)(5) (as amended 1982). Further, HUD approval of an application constitutes approval of "the number and mix of units." 24 C.F.R. § 885.1(a) (as amended 1982). HUD had also required an applicant to describe "the Borrower's capability to ... provide appropriate services in connection with housing...." 24 C.F.R. § 885.210(a)(19) (as amended 1982). HUD's 1978 handbook on Section 202 contains similar provisions. For example, it expressly states that the purpose of Section 202 housing is to provide "housing *and* related facilities to serve the elderly, the physically handicapped, *or* developmentally disabled adults." HUD Handbook 4571.1 Rev, Section 202 Direct Loan Program for the Elderly and Handicapped (March 10, 1978). Since the two memoranda at issue herein did not alter HUD policy, and were thus "typical of the type of information provided in agency staff manuals," and in the applicable regulations, publication was not required. *See Donovan v. Wollaston Alloys, Inc.,* 695 F.2d 1, 9 (1st Cir.1982); *accord Burroughs v. Hills,* 741 F.2d 1525 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985). As to the misunderstanding between the National and Regional HUD offices as to Section 202 housing, we agree with the district court that the appellants may not use this misunderstanding to create a right to be admitted to QBB. *See* 607 F.Supp. at 439–40.

■ Finally, appellants contend that their exclusion from QBB violates Section 504 of the Rehabilitation Act of 1973, which provides that "no otherwise qualified individual ... shall, solely by reason of his handicap" be denied the benefits of a federally funded program. 29 U.S.C. § 794. We reject this claim of a violation, substan-

tially for the reasons set forth in the district court's opinion. *See* 607 F.Supp. at 435–38. From Judge Platt's rather exhaustive treatment of the issue, we note in particular that, in an action brought under the Fair Housing Act of 1968, 42 U.S.C. §§ 3601–31 and the Fourteenth Amendment to the United States Constitution, we held that the providing of housing solely for the elderly, without also providing housing for some other protected group, does not constitute discrimination against nonelderly members of this other protected group. *See Acevedo v. Nassau County,* 500 F.2d 1078 (2d Cir.1974) (cited in 607 F.Supp. at 436 n. 6). We think that the same principle applies here, and that since appellants are not "otherwise qualified" to live in QBB for the reasons set forth in the district court's opinion and herein, the judgment of the district court as to Section 504 should be affirmed.

## CONCLUSION

For all of the above reasons, and those stated in the opinion of the district court, the judgment of the district court is affirmed.