MCI TELECOMMUNICATIONS
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Lexitel Corporation, American Satellite Company, Teltec Saving Communications Co., Mountain States Telephone and Telegraph Co., et al., Competitive Telecommunication Association, Utilities Telecommunication Council, the Western Union Telegraph Co., GTE Sprint Communications Corporation, Network I, Inc., International Business Machines Corporation, Aeronautical Radio, Inc., Telecommunications Research and Action Center, Bell Telephone Company of Pennsylvania, et al., RCA Americom Communications, Inc., Southern Satellite Systems, Inc., Satellite Business Systems, Ad Hoc Telecommunications Users Committee, Rainbow Satellite, Inc., Intervenors.

No. 85–1030.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 3, 1985.

Decided July 9, 1985.

As Amended July 9, 1985.

Kenneth A. Cox, Washington, D.C., with whom Michael H. Bader, William J. Byrnes, Thomas R. Gibbon, Theodore D. Kramer and John M. Scorce, Washington, D.C., were on brief, for petitioner.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Richard A. Askoff, Counsel, F.C.C., Robert B. Nicholson and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

Roger M. Witten, Washington, D.C., with whom J. Roger Wollenberg and William T. Lake, Washington, D.C., were on brief, for intervenor I.B.M. Corp.

Robert F. Corazzini, Washington, D.C., was on brief, for intervenor Southern Satellite Systems, Inc. Deborah Stuehrmann-Salbego, Washington, D.C., also entered an appearance for Southern Satellite Systems, Inc.

Wilhelmina Reuben Cooke, Washington, D.C., was on brief, for intervenors, Telecommunications Research and Action Center and Nat. Ass'n for Better Broadcasting.

Robert B. McKenna and Jeffrey S. Bork, Washington, D.C., were on brief, for intervenors Mountain States Tel. and Tel. Co., et al.

Peter Tannenwald and Vonya B. McCann, Washington, D.C., were on brief, for intervenor Teltec Saving Communications Co.

Rita A. Barmann, Philip M. Walker and Donald E. Ward, Washington, D.C., were on statement in lieu of brief, for intervenors GTE Sprint Communications Corp., et al.

Joseph M. Kittner, Randolph J. May, Timothy J. Cooney, Washington, D.C. and Robert J. Kaufman, New York City, ABC, Inc., Joseph DeFranco CBS, Inc., and Howard Monderer, Washington, D.C., NBC, Inc., entered appearances for intervenors ABC, Inc., et al.

Arthur H. Simms, Washington, D.C., entered an appearance for intervenor, Western Union Telegraph Co.

Joseph M. Kittner and Jean L. Kiddoo, Washington, D.C., entered appearances for intervenor Ad Hoc Telecommunications Users Committee.

Mitchell F. Brecher, Washington, D.C., entered an appearance for intervenor Lexitel Corp.

Joan M. Griffin, entered an appearance for intervenor American Satellite Co.

John A. Ligon, New York City, entered an appearance for intervenor ITT Communications Service, Inc.

Randall B. Lowe and Thomas K. Crowe, Washington, D.C., entered appearances for intervenor Competitive Telecommunications Ass'n.

Neil S. Ende, Washington, D.C., entered an appearance for intervenor Network I, Inc.

John L. Bartlett and Robert J. Butler, Washington, D.C., entered appearances for intervenor Aeronautical Radio, Inc.

Thomas L. Welch, Philadelphia. Pa., entered an appearance for intervenors Bell Telephone Co. of Pennsylvania, et al.

Donald J. Elardo, McLean, Va., entered an appearance for intervenor, Satellite Business System.

Jay E. Ricks, Washington, D.C., entered an appearance for intervenor RCA American Communications, Inc.

George R. Grange, II, Washington, D.C., entered an appearance for intervenor Rainbow Satellite, Inc.

Charles M. Meehan, Washington, D.C., entered an appearance for intervenor Utilities Telecommunications Council.

Before TAMM, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Petitioner MCI Telecommunications Corporation (MCI) challenges a Federal Communications Commission (FCC or Commission) directive, captioned the *Sixth Report and Order*, issued in the Commission's long-evolving *Competitive Carrier* rulemaking.[1] The *Sixth Report* (1) requires all

---

1. *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorization Therefor: Sixth Report and Order,* 57 Rad.Reg.2d (P & F) 1391 (1985) (*Sixth Report*). *Competitive Carrier* rulemaking orders prior to the *Sixth Report* were: *Notice of Inquiry and Proposed Rulemaking,* 77 F.C.C.2d 308 (1979) (*Notice*); *First Report and Order,* 85 F.C.C.2d 1

(1980) (*First Report*); *Further Notice of Proposed Rulemaking,* 84 F.C.C.2d 445 (1981) (*Further Notice*); *Second Report and Order,* 91 F.C. C.2d 59 (1982) (*Second Report*), reconsideration denied, 93 F.C.C.2d 54 (1983); *Further Notice of Proposed Rulemaking,* 47 Fed.Reg. 17,308 (1982); *Third Further Notice of Proposed Rulemaking,* 48 Fed.Reg. 28,292 (1983); *Third Re-*

non-dominant common carriers of interstate telephone service, including MCI, to cancel their tariffs on file with the Commission within six months of the effective date of the order; and (2) declares that the Commission will not accept tariff filings from the non-dominant carriers in the future. MCI moved for a stay of the *Sixth Report;* on April 11, 1985, this court granted the motion and ordered expedited briefing and oral argument. *MCI Telecommunications Corp. v. FCC,* No. 85–1030 (D.C. Cir. Apr. 11, 1985).

The parties tender three issues for review: (1) whether MCI's challenge is timely; (2) whether the Commission has statutory authority to *prohibit* common carriers from filing tariffs; and (3) whether, assuming the Commission's authority, the *Sixth Report* was arbitrary and capricious. We conclude that MCI's petition for review is timely and that the Commission lacks authority to prohibit MCI and similarly situated common carriers from filing tariffs that, by statute, *every* common carrier *shall* file. *See* Communications Act of 1934 (Communications Act), § 203(a), 47 U.S.C. § 203(a) (1982). We therefore vacate the *Sixth Report* and remand this matter to the Commission for further consideration. In view of our conclusion that the FCC's order exceeds the agency's statutory authority, we do not reach the question whether the *Sixth Report* was arbitrary and capricious.

## I. BACKGROUND

### A. *Regulatory Proceedings*

In 1979, the FCC commenced its *Competitive Carrier* rulemaking, a proceeding shaped with a view toward gradual deregulation of the non-dominant common carrier interstate telephone industry. The Commission's initial *Notice* observed that non-dominant companies—those lacking market power—had no ability to charge supra-competitive rates or to engage in predatory pricing. *Notice,* 77 F.C.C.2d at 334. The FCC sought comments on a broad range of options, and its *First Report,* issued in 1980, announced streamlined regulations for non-dominant common carriers. *First Report,* 85 F.C.C.2d at 30–49.[2]

In its 1981 *Further Notice,* the Commission focused on whether to undertake "definitional" or "forbearance" deregulation. The definitional approach entailed classifying certain non-dominant carriers of communication services as noncommon carriers. Because Title II of the Communications Act, 47 U.S.C. §§ 201–224 (1982), applies only to common carriers, this approach would have exempted non-dominant carriers from all Title II regulation. *See Further Notice,* 84 F.C.C.2d at 463–70. The forebearance approach involved abstaining from applying to non-dominant carriers certain Title II procedural requirements while maintaining the basic substantive requirements that carriers charge "just and reasonable" rates and not engage in "unreasonable discrimination." 47 U.S.C. §§ 201–202 (1982); *see Further Notice,* 84 F.C.C.2d at 471–91.

In its *Second Report,* released in 1982, the Commission adopted a forbearance position, *Second Report,* 91 F.C.C.2d at 61–62, which *permitted* resellers of basic services who owned no transmission facilities to cancel tariffs filed with the Commission and to convert to service on a private contract basis. *Id.* at 73. In subsequent 1983 and 1984 orders, the Commission extended permissive forbearance first to specialized common carriers (including MCI) and all resellers, *Fourth Report,* 95 F.C.C.2d at 557, and later to domestic satellite carriers providing domestic interstate service, miscellaneous common carriers, carriers providing domestic, interstate, and interex-

---

port and Order, 48 Fed.Reg. 46,791 (1983); *Fourth Report and Order,* 95 F.C.C.2d 554 (1983) (*Fourth Report*); *Fourth Further Notice of Proposed Rulemaking,* 49 Fed.Reg. 11,856 (1984) (*Fourth Further Notice*); *Fifth Report and Order,* 98 F.C.C.2d 1191 (1984) (*Fifth Report*).

2. Under the streamlined regulations, non-dominant carrier rates were presumed lawful, *First Report,* 85 F.C.C.2d at 33, and new rates could be filed on 14-day (rather than the previously required 90-day) notice. *Id.* at 37.

change digital transmission networks, and affiliates of exchange carriers providing interstate interexchange services. *Fifth Report,* 98 F.C.C.2d at 1209–10.

## B. *Sixth Report*

The *Sixth Report,* target of MCI's petition for review, changed the permissive forbearance arrangement to a mandatory one. Under the previous orders, "forborne" carriers could elect to continue offering service pursuant to filed tariffs, or to cancel their filed tariffs and convert to private contracts. Many new entrants apparently chose not to file tariffs, but the vast majority of existing forborne carriers opted to maintain their services under the tariff system. The Commission's *Fourth Further Notice* requested comment on whether forborne carriers should be required to cancel their tariffs and convert to a carrier-customer individual contract system. *Fourth Further Notice,* 49 Fed.Reg. at 11,857.

In the *Sixth Report* the Commission replied to the comments of numerous parties. The principal arguments confronting the FCC were these: (1) the Commission lacks authority to abolish tariffs, *Sixth Report,* 50 RAD.REG.2d at 1393; (2) the abolition of tariffs would eliminate the repository of information consumers need to detect discriminatory practices, *id.* at 1394; (3) conversion to private contracts would impose an excessive burden on carriers, *id.* at 1394–95; and (4) there are less drastic alternatives, *id.* at 1395–96.

The Commission responded first that it found in section 203(b)(2) of the Communications Act, 47 U.S.C. § 203(b)(2) (1982), "express authority to exempt carriers from tariff filing requirements where appropriate." *Sixth Report,* 57 RAD.REG.2d at 1398. Consumers would benefit in several ways, the Commission reported. Dropping tariff filings would eliminate delay and opportunities for collusive pricing tactics. Furthermore, the absence of filed tariffs could be expected to stimulate the develop-

ment of customer-specific and innovative service offerings. *Id.* at 1399–400. The Commission acknowledged that carriers "might perceive some increased administrative burdens, at least initially," *id.* at 1400, but it considered this prospect outweighed by the positive features of detariffing nondominant carriers. Sufficient information would be available to consumers, the FCC said, because carriers seeking to preserve their competitive position "will make their rates and other information, formerly contained in tariffs, available to the public." *Id.* at 1401. For these reasons, the Commission declared that forborne carriers henceforth would be prohibited from filing tariffs and that forborne carriers with tariffs on file would be required to abolish those tariffs and convert to private contracts within six months. *See id.* at 1393.

On January 11, 1985, MCI petitioned for review.[3] We stayed the challenged Commission action and have considered this case on an expedited basis. *See supra* p. 1. In the discussion that follows, we explain why MCI's petition is timely and why, in obedience to the basic statutory command at stake, we vacate the *Sixth Report.*

## II. DISCUSSION

### A. *Timeliness*

■ The *Sixth Report* was published in the *Federal Register* on January 10, 1985, and MCI filed its petition for review on January 11, 1985, at the very start of the sixty-day period for review petitions. *See* 47 U.S.C. § 402(a) (1982). The Commission concedes that MCI can challenge the *Sixth Report,* but argues that MCI cannot reach beneath the surface of that action to question the basic forbearance decision. MCI centrally maintains that section 203(a) of the Communications Act, 47 U.S.C. § 203(a) (1982), imposes an obligation on common carriers to file tariffs; the FCC, citing that central argument, insists that MCI, a party to the entire rulemaking proceeding, was "aggrieved" by the initial, 1982 forbear-

---

3. This court dismissed an earlier petition for review as prematurely filed. MCI Telecommu-

nications Corp. v. FCC, No. 84–1575 (D.C.Cir. Mar. 12, 1985).

ance decision and should have challenged the *Second Report*. That report, as we recounted earlier, provided for *permissive* forbearance limited to resellers of basic services. If the *Second Report* was not enough, then at least when forbearance was extended to MCI in the *Fourth Report*, the Commission contends, MCI should have petitioned for review. The *Fourth Report*, we have already observed, extended *permissive* forbearance to specialized common carriers, including MCI. We reject the Commission's door-closing argument as inconsistent with our precedent and with a sensible scheme of judicial review.

In a pathmarking decision on the timeliness of review applications, *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C.Cir. 1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959), this court stated:

> As applied to rules and regulations, the statutory time limit restricting judicial review of Commission action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it. For unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.

*Id.* at 546. Recently, in *Montana v. Clark*, 749 F.2d 740 (D.C.Cir.1984), we reaffirmed "that an agency decision not to amend long-standing rules after a notice and comment period is reviewable agency action." *Id.* at 744. The district court in that case had erroneously read *Natural Resources Defense Council v. NRC*, 666 F.2d 595 (D.C.Cir.1981), as establishing a sweeping rule that all would-be petitioners must

come to court at the moment a first cloud appears. We clarified in *Montana:*

> To permit any complainant to restart the limitations period by petitioning for review of a rule, the *NRDC* court recognized, would eviscerate the congressional concern for finality embodied in time limitations on review.
>
> This concern is not present in the instant case. Montana did not contrive to restart the 60-day period by unilaterally seeking repeal of a longstanding regulation. Indisputably, the agency itself initiated rulemaking procedures in 1981. It held out [an existing provision] as a proposed regulation, offered an explanation for its language, solicited comments on its substance, and responded to the comments in promulgating the regulation in its final form.... Unless we are to consider the notice and comment process a meaningless gesture, the [1982] order ... reissuing [the existing provision] constitutes final agency action and is reviewable under the Administrative Procedure Act, 5 U.S.C. § 704.

749 F.2d at 744.

In this case, as in *Montana v. Clark*, the *agency* launched further rulemaking, solicited comments on the substance of a proposed rule, and responded to the comments in arriving at its final order. Rejecting a challenge to its statutory authority to eliminate common carrier tariff filing, the FCC fundamentally altered the forbearance program from a permissive to a mandatory arrangement. As MCI highlights, the permissive character of the earlier orders left carriers who wished to file tariffs free to do so and therefore at least arguably without cause for complaint. Only when the Commission turned permission into command did MCI's aggrievement become evident and plainly adequate to support a challenge to the Commission's forbearance authority.[4]

---

**4.** While we do not reach the question whether MCI would have had standing to challenge the *Second* or *Fourth Report*, we note the Supreme Court's recent instruction in Heckler v. Chaney, —— U.S. ——, 105 S.Ct. 1649, 1656, 84 L.Ed.2d

714 (1985), that an agency's decision not to take enforcement action is presumed unreviewable under § 701(a)(2) of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2) (1982). In this case, the Commission justified its permissive

Disapproving similar FCC argument, this court recently stated:

Although statutory time limitations on judicial review of agency action are jurisdictional, *see Nat'l Bank of Davis v. Office of Comptroller of Currency,* 725 F.2d 1390, 1391 n. 1 (D.C.Cir.1984) (*per curiam*), self-evidently the calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content.

. . . .

. . . It would be patently unfair to hold that an agency's *entirely unspoken* (or impenetrably obscure) belief that Proposition B follows from Holding A may be the basis for precluding judicial review of Proposition B simply because the party aggrieved participated in the administrative proceeding that resulted in Holding A. Yet that is precisely what the FCC asks this court to do.

*RCA Global Communications, Inc. v. FCC,* 758 F.2d 722, 730–31 (D.C.Cir.1985). As in *RCA Global,* "we reject that effort," *id.* at 731, and now turn to the merits of MCI's contention that the Commission lacks statutory authority to prohibit common carrier tariff filings.

**B.** *Statutory Authority*

■ "[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *see National Association of Broadcasters v. FCC,* 740 F.2d 1190, 1201 (D.C.Cir.1984) ("[T]he language of the statute [is] the proper starting point for both agencies and courts as they struggle to sort out the complex and often elusive responsibilities that Congress has delegated to them."). We therefore set out immediately the statutory provision on which MCI rests

its case. Section 203(a) of the Communications Act provides:

*Every* common carrier, except connecting carriers, *shall,* within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers . . . and showing the classifications, practices, and regulations affecting such charges.

47 U.S.C. § 203(a) (1982) (emphasis added). "Shall," the Supreme Court has stated, "is the language of command," *Escoe v. Zerbst,* 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935); "[a]bsent a clearly expressed legislative intention to the contrary," courts ordinarily regard such statutory language as conclusive. *GTE Sylvania,* 447 U.S. at 108, 100 S.Ct. at 2056; *see, e.g., Amalgamated Transit Union v. Donovan,* 767 F.2d 939, 944 (D.C.Cir.1985).

The FCC counters with a further statutory provision, section 203(b)(2) of the Communications Act, 47 U.S.C. § 203(b)(2) (1982), and contends that its "plain meaning" permits the Commission to order the forbearance at issue. *See Sixth Report,* 57 RAD.REG.2d at 1398 (section 203(b)(2) "gives the Commission the express authority to exempt carriers from tariff filing requirements where appropriate"). Section 203(b)(2) provides:

The Commission may, in its discretion and for good cause shown, *modify* any requirement made by or under the authority of this section either in *particular instances* or by general order applicable to *special circumstances or conditions* except that the Commission may not require the notice period . . . to be more than ninety days.

47 U.S.C. § 203(b)(2) (1982) (emphasis added).

orders in part as an allocation of enforcement resources. *See Further Notice,* 84 F.C.C.2d at 454–55. Thus, until forbearance was made mandatory, the FCC's activity was arguably immune from judicial review. *But cf. Chaney,* 105 S.Ct. at 1656 n. 4 (Court did not reach "situation

where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities").

The words "modify ... in particular instances or by general order applicable to special circumstances or conditions" suggest circumscribed alterations—not, as the FCC now would have it, wholesale abandonment or elimination of a requirement. *See, e.g.,* BLACK'S LAW DICTIONARY 905 (5th ed. 1979) ("modify" defined as "[t]o alter; to change in incidental or subordinate features; enlarge, extend; amend; limit, reduce"). Our resistance to the uncommon meaning the Commission currently reads into its "particular instances" and "special circumstances" modification authority is strengthened by precedent closely in point. We now review that precedent.

*American Telephone & Telegraph Co. v. FCC,* 572 F.2d 17 (2d Cir.) (*AT & T Resale*), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), involved a Commission conclusion that resellers of communications services were common carriers subject to regulation under the Communications Act. Prospective resellers challenged this determination. The challengers asserted that resellers were not common carriers; alternatively, they contended that the Commission had discretion to refrain from regulating resellers. The court upheld the Commission's ruling that resellers were common carriers subject to regulation, and then addressed the challengers' alternative contention:

> The FCC has a duty to "execute and enforce the provisions of" the Communications Act, 47 U.S.C. § 151. The Communications Act requires that common carriers furnish service on reasonable request, 47 U.S.C. § 201(a); that rates and practices be just, fair, reasonable and nondiscriminatory, 47 U.S.C. §§ 201(b), 202(a); *that carriers file their tariffs with the FCC,* 47 U.S.C. § 203(a); that the FCC investigate complaints, 47 U.S.C. § 208; that carriers obtain certificates of public convenience and necessity before constructing, acquiring or operating any facilities or terminating any services, 47 U.S.C. § 214; that the FCC examine transactions that might affect rates or services, 47 U.S.C. § 215; and that carriers submit applications for proposed consolidations and mergers to the FCC, 47 U.S.C. § 222. *We are aware of no authority for the proposition that the FCC may abdicate its responsibility to perform these duties and ensure that these statutory standards are met.*

*Id.* at 25 (emphasis added). Even closer to home, in *American Telephone & Telegraph Co. v. FCC,* 487 F.2d 865 (2d Cir.1973) (*AT & T Special Permission*), the court addressed the limits of the Commission's discretion under section 203(b)(2):

> [W]e think that a proper interpretation of Section 203(b) indicates that it does not authorize the Commission to circumvent statutory limitations upon its authority imposed by other sections of the Act. Since Section 203(b) only permits modification of "the requirements made by or under the authority of this section", the Commission may not rely upon this section to circumvent the requirements of Sections 204 and 205 relating to the limitation of the suspension period and the prescription procedure. In short, under Section 203(b) the Commission may only modify requirements as to the form of, and information contained in, tariffs and the thirty days notice provision.

*Id.* at 879.

Counsel for the Commission conceded at oral argument that the FCC has arrived at its fully expanded view of section 203(b)(2) rather lately. By contrast, shortly after the Commission opened its *Competitive Carrier* inquiry, the agency stated in *Western Union Telegraph Co.,* 75 F.C.C.2d 461 (1980):

> There can be no question that tariffs are essential to the entire administrative scheme of the Act. They serve as a kind of "tripwire" enabling the Commission to monitor the activities of carriers subject to its jurisdiction and to thereby insure that the charges, practices, classifications, and regulations of those carriers are just, reasonable, and nondiscriminatory within the meaning of Sections 201 and 202 of the Act. The importance of tariffs and the requirement that common carriers—*all common carriers—must*

*offer all of their communications services to the public through published tariffs* is well established. *See Armour Packing Company v. United States,* 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908). *Id.* at 474 (emphasis added). Harmoniously, the FCC had informed the Second Circuit through the Commission's brief in *AT & T Resale:*

> As to the law, it is plainly wrong to suggest that the Commission could leave resale entities unregulated altogether. *The Commission has affirmative commands from Congress to ensure that rates are just, reasonable and nondiscriminatory, Sections 201, 202; that rates and practices are set forth in tariffs filed with the FCC, Section 203;* and that carriers obtain certificates of public convenience and necessity before obtaining facilities and putting them in operation, Section 214.
>
> *The agency has no authority to ignore these commands, even if market forces arguably are present which undercut the "natural monopoly" justification for regulation.* This much is clear from *Federal Power Commission v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974), where the Supreme Court held that the FPC lacked the authority to leave natural gas rates entirely to the marketplace in abdication of its statutory responsibility to ensure that rates are just and reasonable.

Brief of Federal Communications Commission at 49–50, *AT & T Resale* (emphasis added), *quoted in* Reply Brief for Petitioner MCI Telecommunications Corporation at 12.

In short, at least until 1980, the Commission shared, indeed fostered, the judicial perception of the statutory tariff-filing requirement for common carriers. The requirement could be modified by administrative action, the FCC once understood, but not removed in gross by agency order. We hold that the Commission's prior comprehension of the meaning section 203 will bear was correct, and that the FCC's new view departs from any plausible reading of the statute's text.

As a second line of argument in support of the *Sixth Report,* the Commission asserts general authority to forbear from full Title II common carrier regulation in order to adapt its superintendence to changing circumstances as "the public interest" indicates. The FCC relies principally on four decisions to back up the asserted general authority: *Wold Communications, Inc. v. FCC,* 735 F.2d 1465 (D.C.Cir.1984); *Computer & Communications Industry Association v. FCC,* 693 F.2d 198 (D.C.Cir. 1982), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); *Western Union Telegraph Co. v. FCC,* 674 F.2d 160 (2d Cir.1982); and *Philadelphia Television Broadcasting Co. v. FCC,* 359 F.2d 282 (D.C.Cir.1966). These decisions lack the breadth that the FCC attributes to them. They provide no warrant for erasing the congressional instruction in section 203(a) that *every* common carrier *shall* file tariffs.

*Wold Communications* upheld the Commission's decision to allow the sale of certain discrete satellite transponders on a noncommon carrier basis. The FCC isolates and quotes this court's statement that "the public interest touchstone of the Communications Act, beyond question, permits the FCC to allow the marketplace to substitute for direct Commission regulation in appropriate circumstances." 735 F.2d at 1475. The "appropriate circumstances" in *Wold* included the Commission's representation that it had made "a modest adjustment" and had not "displaced regulated common carrier service as the dominant mode." *Id.* at 1468. The "limited departure from the status quo" approved in *Wold, id.* at 1469, concerned "noncommon carrier offerings," *id.* at 1474, and did not implicate, as this case does, "unfettered discretion to regulate or not [ ] regulate common carrier services." *Id.* at 1475 (quoting *Computer & Communications Industry Association,* 693 F.2d at 212).

*Computer & Communications Industry Association* held 'reasonable "[t]he

Commission's finding that enhanced services and CPE [customer premises equipment] are not common carrier communications activities within Title II." 693 F.2d at 209. Similarly, *Western Union* upheld the Commission's decision to detariff terminal equipment, based on the FCC's reasonable conclusion that the sale or lease of that equipment was not a communications service. 674 F.2d at 165. *Philadelphia Television* also involved regulation—there of community antenna television (CATV)—of noncommon carrier activity:

> [The Commission's] holding that CATV systems are not common carriers thus comes before us in a context of regulation ... under different provisions of the Communications Act. In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to *some leeway* in choosing which jurisdictional base and which regulatory tools will be most effective in advancing the Congressional objective.

359 F.2d at 284 (emphasis added).

In this case, the services provided by the non-dominant carriers remain common carrier services. Indeed, at an earlier stage of the *Competitive Carrier* rulemaking the Commission apparently rejected a definitional approach. *See Second Report,* 91 F.C.C.2d at 61–62 & n. 7. Therefore, decisions that depend on classification of the service or operation in question as outside the common carrier context will not travel the distance the Commission would take them.

Finally, the Commission urges that the *Sixth Report* orders an altogether rational regulatory reduction because "competitive marketplace forces in almost all cases will be sufficient to assure just and reasonable rates." Brief for Respondents at 51.

However reasonable the Commission's assessment, we are not at liberty to release the agency from the tie that binds it to the text Congress enacted. Significantly, the Commission's search for support leads it to decisions upholding the exemption of cer-

tain airline, railroad, and trucking services from tariff filing requirements—cases in which Congress had supplied explicit deregulatory authority.

In *Central & Southern Motor Freight Tariff Association v. United States,* 757 F.2d 301 (D.C.Cir.1985) (per curiam), for example, we upheld Interstate Commerce Commission orders exempting motor contract carriers of property from the tariff filing requirements of the Motor Carrier Act, 49 U.S.C. §§ 10,101–11,917 (1982). We relied on the

> sweeping text of the statutory exemption provisions. These provisions uniformly sanction relief "when relief is consistent with the public interest and the transportation policy of section 10101 of this title." The original provisions—whose substance continues in force despite the semantic changes wrought by the 1978 recodification—stressed the breadth of the Commission's discretion by stating that "the Commission may ... grant such relief *to such extent and for such time, and in such manner as in its judgment* is consistent with the public interest and the [national transportation] policy." What we have, to use the Fifth Circuit's words, is a congressional charge to "go forth and do good." The delegation to the Commission is as broad as Congress could make without giving the Commission carte blanche.

*Id.* at 314–15 (footnotes omitted).

Similarly, *National Small Shipments Traffic Conference, Inc. v. CAB,* 618 F.2d 819 (D.C.Cir.1980), upheld detariffing domestic air cargo carriers based on sweeping changes Congress made in the regulatory regime:

> Section 416(b) and 418(c) grant the Board very broad discretion. The latter authorizes the Board to exempt all-cargo carriers from "*any* * * * section of this chapter which the Board by rule determines appropriate * * *." 49 U.S.C. § 1388(c) (Supp. I 1977) (emphasis added). The former permits the Board to exempt "any person or class of persons" from "*the requirements* of this title or any

provision thereof \* \* \* if it finds that the exemption is consistent with the public interest." Pub.L. No. 95–504 § 31(a) (emphasis added). Thus, as petitioners concede, the plain language of the statute authorizes the Board's action.

*Id.* at 827.

*Brae Corp. v. United States,* 740 F.2d 1023 (D.C.Cir.1984) (per curiam), *cert. denied,* —— U.S. ——, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985), upheld deregulation of freight boxcar rates. In the Staggers Act, Congress stated:

> In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission *shall* exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—
>
> (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
>
> (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10,505(a) (1982) (emphasis added). We sought to follow the congressional lead:

> Congress itself has found that the structure of the transportation industry has changed so that "many of the Government regulations affecting railroads have become unnecessary and inefficient," ... and has furthermore commanded the Commission to remove by exemption "as many as possible of the Commission's restrictions on changes in prices and services by rail carriers." ... Given that explicit congressional mandate, we do not believe the Commission need as exhaustively review and explain away its original justifications for abandoned regulations as if it were operating under the same statute it always had.

740 F.2d at 1038.

Perhaps most tellingly, Congress has armed the FCC, in the Record Carrier Competition Act of 1981, Pub.L. No. 97–130, § 2, 95 Stat. 1687, with authority of the kind the Commission would exercise here without statutory change. In the Record Carrier legislation Congress instructed:

> The Commission shall, to the *maximum extent feasible,* promote the development of fully competitive domestic and international markets in the provision of record communications service, so that the public may obtain record communications service and facilities (including terminal equipment) the variety and price of which are governed by competition. In order to meet the purposes of this section, the Commission *shall* forbear from exercising its authority under [Title II of the Communications Act] as the development of competition among record carriers reduces the degree of regulation necessary to protect the public.

47 U.S.C. § 222(b)(1) (1982) (emphasis added); *see RCA Global Communications, Inc. v. FCC,* 758 F.2d 722 (D.C.Cir.1985).

But Congress has not given the FCC new instruction for the case at hand. As the Second Circuit stated in *AT & T Special Permission:*

> In enacting Sections 203–05 of the Communications Act, Congress intended a specific scheme for carrier initiated rate revisions. A balance was achieved after a careful compromise. The Commission is not free to circumvent or ignore that balance. Nor may the Commission in effect rewrite this statutory scheme on the basis of its own conception of the equities of a particular situation.

487 F.2d at 880 (footnote omitted). In sum, if the Commission is to have authority to command that common carriers not file tariffs, the authorization must come from Congress, not from this court or from the Commission's own conception of how the statute should be rewritten in light of changed circumstances.

CONCLUSION

For the reasons stated, we vacate the Commission's decision prohibiting common

carriers from filing tariffs. In so ruling, we do not reach the question whether the FCC's earlier permissive orders are invalid.[5] We note that the Commission could further streamline the regulation of non-dominant carriers without encountering any contrary congressional prescription. *See Sixth Report*, 57 RAD.REG.2d at 1395–96. But to proceed in the manner ordered by the *Sixth Report*, the Commission, in our view, must obtain leave of Congress. We may interpret the FCC's authority generously, but we are not positioned to confer upon the agency "unfettered discretion to regulate or not regulate common carrier services." *Computer & Communications Industry Association*, 693 F.2d at 212.

The order under review is vacated and the case is remanded to the Commission for further consideration and action consistent with this opinion.

*It is so ordered.*