**LEVER BROTHERS COMPANY,**
Plaintiff,

v.

**UNITED STATES of America,**
et al., Defendants.

**Civ. A. No. 86–3151 (HHG).**

United States District Court,
District of Columbia.

April 15, 1992.

On Motion to Alter or Amend
April 28, 1992.

On Motion to Reconsider May 18, 1992.

William K. Wells, Jr., C. Scott Talbot, Richard S. Meyer, Kenyon & Kenyon, Washington, D.C. (Lynne Darcy, Kenyon & Kenyon, Walter M. Volpi, Lever Bros. Co., New York City, of counsel), for plaintiff.

Daniel J. Standish, Asst. U.S. Atty., Washington, D.C. (Alfonso Robles, U.S. Customs Service, U.S. Dept. of Treasury, of counsel), for defendants.

William H. Allen, Eugene A. Ludwig, David R. Grace, Mark A. Chinen, Covington & Burling, Washington, D.C., for amicus curiae the Coalition to Preserve the Integrity of American Trademarks.

Elliot Bredhoff, Bredhoff & Kaiser, Washington, D.C., John McKendree, Gen. Counsel, Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO, Denver, Colo., John D. Vandenberg, Klarquist, Sparkman, Campbell Leigh & Whinston, Portland, Or., for amicus curiae Oil, Chemical & Atomic Workers International Union, AFL–CIO.

Diane Heiman, Bethesda, Md., for amicus curiae The Nat. Consumers League.

Robert W. Steele, Cheryl M. Browning, Steele, Silcox & Browning, Washington, D.C., for amicus curiae Kmart Corp.

Stephen Kurzman, Nixon, Hargrave, Devans & Doyle, Washington, D.C., for amicus curiae American Free Trade Ass'n.

Robert J. Verdisco, Washington, D.C., for amicus curiae International Mass Retail Ass'n.

Richard Kelly, Kelly, Eckhaus & Mohen, New York City, for amicus curiae National Ass'n of Catalog Showroom Merchandisers.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiff is a United States corporation which manufactures a soap under the trademark "Shield," and a dishwashing detergent under the trademark "Sunlight" for sale in the United States. A British corporation that is affiliated with plaintiff also makes a soap and a dishwashing detergent using as trademarks the names "Shield" and "Sunlight." The American and British versions, while having generally similar appearances, are physically different apparently because of the different tastes of American and British consumers. Third parties have directly or indirectly acquired the British "Shield" and "Sunlight" products and imported them into the United States.

Plaintiff Lever Brothers Company (hereinafter Lever U.S.) received complaints from consumers who unknowingly purchased the British versions of the products and were dissatisfied. Lever U.S., objecting to the importation of the British Shield and Sunlight products, sought a preliminary injunction against the U.S. Customs Service, on the ground that section 42 of the Lanham Act, 15 U.S.C. § 1124, barred entry of the foreign products.[1] The Court denied the motion. The Court of Appeals reversed, finding, as a "tentative conclusion," that the language of section 42 of the Lanham Act requires the Customs Service to bar the foreign made products at issue. *Lever Bros. Co. v. United States,* 877 F.2d 101 (D.C.Cir.1989). The Court of Appeals remanded the matter for consideration of the legislative history of section 42 and the relevant administrative practice.

*Id.* at 111. The only question before the Court is a legal one, and accordingly both parties have moved for summary judgment.

### I

### *Facts*

Plaintiff, Lever U.S., is a wholly-owned subsidiary of Unilever U.S., Inc., which in turn is wholly owned by Unilever N.V. A British company, Lever U.K., manufactures "Shield" and "Sunlight," and holds the trademark for those words in the United Kingdom. Lever U.K. is a subsidiary of Unilever PLC. The two corporate parents, Unilever N.V. and Unilever PLC, are not under common ownership but are affiliated with one another and are under common control. *Lever Bros. Co. v. United States, supra,* 877 F.2d at 102 n. 1.

The "Shield" logos on the American and the British versions of the soap are virtually identical. The American product, however, is designed to produce more lather and contains an anti-bacteria agent absent from the British version. The two soaps are also perfumed and colored differently.

The two versions of "Sunlight" dishwashing detergent have similar lettering but the packaging is different. The detergents themselves are also quite different. The British product is designed for water with a mineral content higher than is generally found in the United States. It therefore does not perform as well as the American "Sunlight" in the "soft water" typical of this country. Thus the trademarks of the American and British versions of the two products are identical but the products are physically different.

Third parties have imported the British versions of the products into the United States without the consent of Lever U.S. or Lever U.K. The outward similarities and substantive differences of the American and British products created confusion and dissatisfaction on the part of American consumers who purchased the British products in the belief that they were purchasing the

---

**1.** Lever U.S. also argued that section 526 of the    Tariff Act barred import of the British products.

American version or not realizing that there were two different products under the same name.

This case focuses on interpretation of section 42 of the Lanham Act which states that:

> no article of imported merchandise which shall *copy or simulate the name* of the [sic] any domestic manufacturer, ... or which shall *copy or simulate a trademark* registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, ... shall be admitted to entry at any customhouse of the United States....

15 U.S.C. § 1124 (1982) (emphasis added).

Lever U.S. argues that where a foreign company produces goods that bear the same trademark as a U.S. markholder but that are materially, physically different, the foreign products copies or simulates the domestic trademark within the meaning of section 42 even where the foreign manufacturer is affiliated with the domestic markholder. Defendants argue that a markholder cannot infringe, *i.e.*, "copy or simulate," its own trademark, and that therefore the affiliation of Lever U.S. with Lever U.K. makes all the difference, placing this case outside the scope of section 42.

The Customs Service has permitted the British versions of the two products to enter the United States under its affiliate exception. Under the Customs Service regulation, foreign goods that bear a trademark identical to one owned and recorded by a United States corporation will not be seized by Customs, notwithstanding section 42 of the statute, if "[t]he foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control." 19 C.F.R. § 133.(c)(2) (1988).

The Court of Appeals has come to the tentative conclusion that the Lanham Act bars "foreign goods bearing a trademark identical to a valid U.S. trademark but which are physically different, regardless of the trademarks' genuine character abroad or affiliation between the producing firms." *Lever Bros. Co. v. United States, supra*, 877 F.2d at 111. However, as indicated, the appellate court remanded the case for consideration of the legislative history and the administrative practice.

## II

### *Legislative History*

The Court of Appeals regarded its reading of the language of section 42 as being "the natural, virtually inevitable" interpretation. *Id.* at 111. It is well established that where the statute is clear on its face and the legislative intent is expressed in "reasonably plain terms" by the text, the statutory language controls. *Griffin v. Oceanic Contractors Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Only a "very clear expression in the legislative history of congressional intent to the contrary [will] justify the conclusion that the statute does not mean what it so plainly seems to say." *Aaron v. S.E.C.*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980).[2]

Nevertheless, in accordance with the decision of the Court of Appeals, this Court has reviewed the legislative history for any evidence that would rebut or undermine the initial construction based on the text of the statute. *See Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1214 n. 12, 94 L.Ed.2d 434 (1987); *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121–22, 92 L.Ed.2d 483 (1986); *Aaron v. S.E.C., supra*, 446 U.S. at 697, 100 S.Ct. at 1956; *Transbrasil S.A. Linhas v. Dept. of Transportation*, 791 F.2d 202, 206–07 (D.C.Cir.1986). The Court has concluded that there is no significant evidence in the

---

**2.** Similarly, in this case the Court of Appeals observed that although its interpretation of the statute was "tentative" and "provisional," only "persuasive evidence running against" the court's interpretation would warrant a ruling in defendants' favor. 877 F.2d at 111.

legislative history to contradict the conclusion that section 42 bars the import of foreign goods that bear a trademark identical to a valid U.S. trademark merely because the foreign manufacturer is affiliated with the American markholder.

The legislative history of the Act reveals consideration of a common-ownership but not of an affiliate exception to the Act. In 1944, the General Counsel of the United States Tariff Commission[3] submitted a Memorandum to a subcommittee of the Committee on Patents of the United States Senate. That Memorandum stated that under the 1905 Trademark Act the ban on the importation of infringing goods did not apply to the markholder's own merchandise, that is, where the United States and the foreign trademarks were owned by the same person. *Hearing Before a Subcomm. of the Senate Comm. on Patents on H.R. 82,* U.S. Senate, 78th Cong.2d Sess. 86–87 (1944). As the Court of Appeals noted, however, this reference to a common-ownership exception of course "falls far short of ratification of the affiliate exception." 877 F.2d at 106.

Even with respect to common ownership goods, the memorandum referred to "articles *identical* with those sold by the registrant under his mark and bearing identical trade-marks." *Id.*[4] In the instant case, as noted, the articles involved, while they bear the same trademark, are physically different. On that basis, the Memorandum itself does not undermine the Lever U.S. position.

Even as viewed from a broader perspective, the same result follows. Representative Fritz G. Lanham, the sponsor of the Act, explained that one purpose of the statute was "to protect the public so that it may be confident that, in purchasing a product bearing a particular trade-mark, with [sic] it favorably knows, it will get the product which it asks for and wants to get." H.R.Rep. No. 219 at 2, 79th Cong., 1st Sess. (February 26, 1945) U.S.Code Cong.Serv.1946, p. 1274. In this case, the outward similarities and physical differences between the British and American versions of "Shield" and "Sunlight" have already created consumer confusion and dissatisfaction, and they would be likely to do so again in the future. As the House Report on the Lanham Act stated, "Trademarks encourage the maintenance of quality by securing to the producer the benefit of the good reputation which excellence creates." H.R. No. 219 at 3, 1946 U.S.Code Cong.Serv. at 1274, 1275. Thus, the legislative goals of trademark law generally and of the Lanham Act specifically are served by the barring of goods such as those of the British company.

### III

#### Administrative Practice

█ In addition to a consideration of the legislative history of section 42, the Court was directed by the Court of Appeals to consider the relevant administrative practice.

The administrative practice of the Custom Service is of uncertain constancy. Customs first applied a same-company exception to section 27 of the Trademark Act of 1905, the predecessor to section 42 of the Lanham Act. Subsequently, in 1953, the agency adopted a "related companies" exception, T.D. 53399, 18 Fed.Reg. 8685, 8688 (December 24, 1953), the first real antecedent to the current affiliate exception. However, in 1959 Customs eliminated the related-companies provision and utilized the more narrow same-company exception.

---

3. Now the International Trade Commission.

4. The same may be said for Customs' pre-Lanham interpretation of the words "copy or simulate," which also dealt with identical goods. The affiliate exception emerged in 1936 as part of Customs' implementation of the Tariff Act of 1930 and section 27 of the Trademark Act of 1905. The 1936 policy was much narrower, however, than Customs' subsequent affiliate exception, for it permitted the import of trade-marked goods only if the domestic and foreign maker were "owned by the same person, partnership, association, or corporation." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 310, 108 S.Ct. 1811, 1827, 100 L.Ed.2d 313 (Brennan, J., concurring in part and dissenting in part), *quoting* T.D. 48537, 70 Treas. Dec. 336–337 (1936). The 1936 policy was essentially a common-ownership or same-company exception, rather than an affiliate exception.

T.D. 54932, 24 Fed.Reg. 7522 (September 18, 1959).

There is no evidence that the Congress acquiesced in these interpretations. In 1954 Congress was considering a revision of section 42 supported by the Treasury Department that would have explicitly incorporated the affiliate exception into section 42. The Customs Service here points to a letter from a State Department official to the Chairman of the Subcommittee on Patents, Trade–Marks and Copyrights of the Senate Judiciary Committee which states that the Treasury Department considered the affiliate exception to be implicit in the existing law but sought to "clarify" the matter by incorporation of the exception into the law itself. *Hearings Before a Subcomm. of the Comm. of the Judiciary,* U.S. Senate, 83d Cong., 2d Sess. 96 (April 35, 1954). Congress did not enact the amendment.

It is the government's argument based on the failure of the affiliate exception amendment that Congress was aware of the Treasury interpretation and did nothing to alter it. But it is equally true that Congress considered the exception and did not adopt it.[5] At best, the legislative silence argument is inconclusive.

The inconstancy of Customs' position as of that time was noted by one commentator in 1969, John F. Atwood, *Import Restriction on Trademarked Merchandise—The Role of the United States Customs Service* (who noted that Customs policy has "not remained constant"). 59 Trademark Reporter 301 (1969).

In 1972 Customs adopted its current affiliate exception. It is significant, however, that thereafter the government reversed its position in its brief as *amicus curiae* in *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* No. 82–7857 (2d Cir. February 25, 1983). In that brief the Department of Justice stated that both sections 32 and 42 of the Lanham Act confer an exclusionary right on a United States markholder regardless whether "the owner of the U.S.

mark is owned or controlled by the foreign manufacturer of the trademarked goods." Brief of the United States as *Amicus Curiae, Bell & Howell: Mamiya Co. v. Masel Supply Co.,* No. 82–7857 (2d Cir. February 25, 1983) at 7–8.

More recently, the Customs Service proposed the deletion of a provision related to the affiliate exception which further erodes the weight of the agency's prior practice. Customs has proposed by way of a rulemaking deletion of 19 C.F.R. § 133.-21(c)(3)—which establishes an exception to section 42 of the Lanham Act. *See* 54 Fed.Reg. 51,035 (Dec. 12, 1989). Section 133.21(c)(3) interprets section 42 as permitting the importation of articles of a foreign manufacturer that bear a mark identical to a U.S. trademark when the use of the trademark has been authorized by the U.S. markholder. But there is little substantive difference between the unauthorized importation of a licensee's foreign goods and the unauthorized importation of a foreign affiliate's goods.

The variance in Customs' position over time is the sort of erratic administrative practice that deprives the agency interpretation of substantial weight. *See Barnett v. Weinberger,* 818 F.2d 953, 961 (D.C.Cir. 1987); *Abourezk v. Reagan,* 785 F.2d 1043, 1056 (D.C.Cir.1986); *United Transportation Union v. Lewis,* 711 F.2d 233, 242–43 (D.C.Cir.1983). The administrative practice of the Customs Service is at best inconstant and cannot be regarded as persuasive authority for the purposes of construing a statute that is otherwise unambiguous. This conclusion is reinforced by the fact that in its administrative practice Customs has never addressed the specific question of physically different goods that bear identical trademarks, the issue presented by this case.

## IV

### Conclusion

Neither the legislative history of the statute nor the administrative practice of

---

5. Plaintiffs also point to other subsequent amendments that would have adopted the affiliate exception but which Congress did not enact. *See* H.R. 9476, 83rd Cong., 2d Sess. (1954); S. 2540, 83rd Cong., 2d Sess. (1954); H.R. 11453, 84th Cong., 2d Sess. (1956); H.R. 7234, 86th Cong., 1st Sess. (1959).

the Customs Service clearly contradicts the plain meaning of section 42. The Court therefore concludes that section 42 of the Lanham Act prohibits the importation of foreign goods that bear a trademark identical to a valid United States trademark but which are physically different, regardless of the validity of the foreign trademark or the existence of an affiliation between the U.S. and foreign markholders.

Plaintiff's motion for summary judgment will be granted and defendants' motion will be denied. An Order consistent with this Memorandum is being issued contemporaneously herewith.

## ON MOTION TO ALTER OR AMEND

■ Currently pending before the Court are motions by defendants to alter or amend the Court's Order in this case of April 15, 1992, for a temporary stay and a stay pending resolution on appeal. The Court will amend the April 15, 1992 Order so that it conforms to the holding of the Court's Memorandum issued concurrently with the Order.

The motions for a stay will be denied. In order for a stay to be granted the movant must satisfy all of four factors: (1) the likelihood of success on the merits; (2) irreparable injury to the movant; (3) the harm to other parties; and (4) the public interest. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). Here the defendants have little likelihood of success on the merits and the Court need not consider, therefore, the remaining factors.

This Court's April 15, 1992 ruling is consistent with what the Court of Appeals termed "the natural, virtually inevitable" interpretation of section 42 of the Lanham Act. *See Lever Bros. Co. v. United States*, 877 F.2d 101, 111 (D.C.Cir.1989). The Court of Appeals regarded its interpretation of the statute sufficiently clear that it remanded the case solely for the purposes of determining whether the legislative history of the Lanham Act or relevant administrative practice cast doubt on the plain meaning of the statute. *See id.* The Court of Appeals commented further,

"[W]e must say that Lever's probability of success on its legal argument is quite high." *Id.*

Although, as defendants argue, the interpretation by the Court of Appeals for this Circuit may differ from that of Courts of Appeals for other Circuits, defendants' likelihood of success must be assessed with regard to this Circuit, not the Second or the Ninth. This Court is of course bound by the law as explained by the Court of Appeals for the District of Columbia Circuit. Only earlier this month did that court observe that its interpretation of section 42 differed from that of other Circuits and yet it expressed no uncertainty or equivocation about its opinion in *Lever Bros. See Yamaha Corp. of America v. United States*, 961 F.2d 245, 248 n. 2, 258 (D.C.Cir.1992). As defendants' likelihood of success on the merits is particularly poor, there is no basis for a stay.

Upon consideration of the motions, and the entire record herein, it is this 28th day of April 1992

ORDERED that the motion to alter or amend the judgment be and it is hereby granted; and it is further

ORDERED that the fourth paragraph of the Court's Order of April 15, 1992 is amended as follows:

> ORDERED that the United States Customs Service be and it is hereby enjoined from enforcing 19 C.F.R. § 133.21(c)(2) as to foreign goods that bear a trademark identical to a valid United States trademark but which are materially, physically different;

and it is further

ORDERED that the motions for a stay be and they are hereby denied.

## ON MOTION TO RECONSIDER

On April 15, 1992 this Court ruled that the Customs Service's "affiliate" exception to section 42 of the Lanham Act was inconsistent with the language and legislative history of the Act. Accordingly the Court enjoined the Customs Service from enforcing the exception embodied at 19 C.F.R. § 133.21(c)(2).

On April 28, 1992, the Court amended its order so that it would more clearly correspond to the Court's April 15th Opinion. The amended Order reads, in relevant part:

ORDERED that the United States Customs Service be and it is hereby enjoined from enforcing 19 C.F.R. § 133.21(c)(2) as to foreign goods that bear a trademark identical to a valid United States trademark but which are materially, physically different.

Plaintiff has moved the Court to reconsider the amended Order because it objects to the qualifier "materially" and moves, therefore, that it be deleted. The motion is without basis.

The holding of both this Court and the Court of Appeals, *Lever Bros. Co. v. United States*, 877 F.2d 101 (D.C.Cir.1989), emphasized that the United States and foreign goods at issue were not simply physically different, but that the physical differences were material. *Lever Bros. Co., supra*, 877 F.2d at 102 (the products at issue "differ materially in the two countries"); *id.* at 103 ("the contents of the packages differ materially"); *id.* at 109 (citing a case that leaves open the issue of trademark infringement where the "goods were materially different"); *Lever Bros. Co. v. United States*, No. 86–3151, slip op. at 4 (D.D.C. April 15, 1992) ("Lever U.S. argues that where a foreign company produces goods that bear the same trademark as a U.S. markholder but that are materially, physically different" the foreign products infringe the trademark under section 42).

Upon consideration of the motion for reconsideration of the amended Order, the opposition and reply thereto, and the entire record herein, it is this 18th day of May 1992

ORDERED that the motion for reconsideration be and it is hereby denied.